It's the United States of America versus Reuben Boria, Mr. Zosmer. Good afternoon, Your Honor. May I please the court, Robert Zosmer on behalf of the government. If I may, Your Honor, I'd like to reserve two minutes for rebuttal. That request will be granted. Thank you very much. Your Honors, the issue presented in this case is simple and it's straightforward. The question is, we have the simple facts of this case. A person is recruited to take a truck, be responsible for it, find a warehouse for it, take it somewhere to unload it, and to handle the unloading of the truck. May a reasonable jury infer that that person knows the purpose of the job for which he's been retained. In this case, the jury found beyond a reasonable doubt that Mr. Boria knew that this offense involved cocaine, a considerable amount of cocaine. The drugs were hidden inside the truck, weren't they? They were. You know, the language, to finish off what needs to be done inside the truck. You're supposed to take the driver of the tractor-trailer for that purpose. Is that enough? It is. Well, Mr. Alvarado, whose testimony Your Honor is quoting, said this in several ways right in that same area of the transcript. He used the words unloading, finish it off, take care of it, and it's clear from just the circumstances that that was Mr. Boria's job. There was no one else that we know of in this sequence of events who was going to be there and do that. And yes, it is enough. The question here, Your Honor, is what is a reasonable inference? If someone is given a job... Does the fact that those statements came from a co-conspirator add additional weight to it? I think it adds as much weight as if it came from anyone else. Certainly it's... No more? It's hard to say, but the important question, what we need to focus on here, as I know Your Honors are well aware, is the standard of review. The standard of review is, is there evidence on which a jury could rely to find guilt? And that certainly, of course, is evidence on which a jury could rely. Does it matter that Boria wasn't present when those statements were made by the co-conspirators? No. They were admitted as co-conspirator statements, and that's not an issue that's been preserved. That is evidence in the record, and it's very reliable evidence. We also know that there's more to it than just Alvarado's statement. If you look at the way this whole conspiracy operated, we're dealing here, if I could take a minute just to dwell on this, we're dealing with a very sophisticated organization that is shipping huge loads of cocaine all over the country from the other testimony, 100 kilograms at a time going to multiple states, and Philadelphia is just one of the destinations. And the DEA managed to get an undercover agent to be one of the drivers on one of the shipments. And that's very important because he explained how it is they do this, and how they do it is they take it to wherever the local destination is. The driver along the way does not know where the drugs are. He knows he's ferrying drugs, but he doesn't know where they are in the truck. He gets to the local spot, hooks up with the local agents of this organization, and only then is informed where to go in the truck. Because, of course, we know in this instance you've got this enormous amount of rotten produce that's in the back of the truck. These people are not going to spend hours going through rotten produce. They're going to find out exactly where the cocaine is and go get it. And the agent explained that's what happened. He got to the destination. He was told, I think it was count nine rivets down the tarp and then go down to your left, and that's where you'll find the cocaine. So the jury can infer something from that also. They can infer that you don't have this Duke warrior who's sent out in the morning on a truck to find a warehouse, not knowing what he's doing, not knowing where he's going, and not knowing what he's going to unload. They can infer that the way this sophisticated operation works is he's going to be the local person. Why couldn't a jury in Idowu make the same inference? Well, in Idowu, the difference there is that Mr. Idowu did not have possession of the suitcase until the very last moment. Here, Borea is put in possession of the truck for all intents and purposes. It's now his to dispose of. Now, I will say, as I'm sure your honors are well aware, the government disagrees with the Idowu decision. We did then. We always have. We have a great deal of concern, which I'd be happy to address today if I have time, about the line of precedent in this court, only in this specific area, involving the sufficiency of the evidence for accomplices in drug cases. Where do you think we got off base? I think the court, with all respect, as your honor knows, I think the court got off base around the Wexler decision and in the 1980s. I think the problem that happened was there were a couple decisions, Wexler and Idowu, that are very hard to explain. They're very difficult to reconcile with decisions of this court that don't involve drugs and with decisions of other courts. I mean, I might agree with you, but could it be that this was at a time when the guidelines were very draconian and perhaps this court did not want to involve defendants in major drug quantities without certain evidence that they were certainly involved? And now, with the new system of sentencing, maybe that isn't as much of a concern anymore? Is it time to change the approach? I don't think any other circuit takes that approach. There is no other circuit that takes that approach. This is a unique problem, if I may say, in the Third Circuit, and it has been for many years. And it's a problem for law enforcement because it affects the way in which we charge cases... Which specific... I'm not saying specific case. Are you saying that it's our requirement that there is proof of knowledge of the specific contraband that distinguishes us from other circuits? Yes. In the area of drug cases, for accomplice liability, one could read some of these cases as to require actual proof of actual knowledge and not simply proof from which a jury may infer knowledge. That's based on our statements in some of the cases, I assume, to the effect that, well, it could have just as easily been Jules. Exactly. Wexler is a prime example of that. It could have been contraband. It could have been stolen gems. On that question, does it make a difference what drug it is? What if it's a cocaine case and it could have been marijuana? Well, this Court's decision in Barbosa, which is not affected by any of this, is that the defendant does not need to know what type of controlled substance it is. Simply does need to know it is a controlled substance. Right. But I'm wondering, is that a principal distinction? Is there any logical distinction between us saying that in Barbosa, that, well, you don't need to know whether it's cocaine or marijuana, on the one hand, in these cases that we're discussing today, where it says, well, it could be Jules or other drugs? I don't think that's where we get off base. Because we don't dispute the basic proposition. The government must prove beyond a reasonable doubt that the defendant knows the purpose is to distribute a controlled substance. We don't dispute that. What we dispute is, what evidence can a jury rely on and what inferences can it make in order to reach that conclusion, that the person knew there was a controlled substance. And our position in these cases, I want to get back, of course, to this case. I think we have a bit more evidence in this case than in some of the others. But in all of the cases, you have evidence on which a jury can logically rely. Here, for example, one can say, if someone's given the job of unloading a truck that has $2.5 million worth of cocaine in it, a jury can draw a reasonable inference that you don't put that in the hands of someone who has no idea what he's doing or why he's been hired. That's a reasonable inference of knowledge that there's a controlled substance. Idowu should have turned out the same way also, but here we have the additional evidence that Mr. Boria is put in charge of the truck. So what really this is about, the problem that I'm identifying, though again, I'm not sure it has to be resolved here, but the problem involves the standard of review. The Supreme Court in Jackson v. Virginia is explicit. The standard of review is, there must be sufficient evidence taking all inferences to support the verdict. And that any rational trier of fact could rely on. And competing inferences do not need to be eliminated. And the problem, if I again respectfully say, in some of this Court's decisions... It's highly deferential to the jury, there's no question. Exactly, because we have a jury system. We rely on juries. And you're charged to find this beyond a reasonable doubt, which means we assume that they've done that. Well, we do, and we look at the particular evidence in this case. When someone again is given charge of this mission to unload this truck with this quantity of cocaine, if someone accepts the inference that a person normally knows the purpose of the illegal venture in which he's engaging, that, sure, you can make that conclusion beyond a reasonable doubt. Notwithstanding, Ioffice and Rioros, I count  Kupler, Wexler, Salmon, Weddell, Cartwright, Civella. Do we need to go in bank to change this approach? Your Honor, I wish I could say yes. I want to say yes. Because this has been a problem for the government for many, many years. I would welcome an in-bank argument in this case, and our office would welcome that. But I have to honestly answer the question. I think we have faithfully distinguished those cases also, and that we may have enough evidence where a panel could decide, and should decide, that there was sufficient evidence in this court here. But I do think it would be a very, I'm just going to step outside my role slightly as an advocate in this particular case, and say that it would be a very positive development for this court, for the consistency of the law in this circuit as opposed to other circuits, to have an in-bank argument one day regarding this area of the law. Because not only is this court's precedent, you've got me on a roll here now, not only is this court's precedent inconsistent with that of other circuits, but it's internally inconsistent. Because as you mentioned, the Aya Feliz and Ray Eros cases, you can try to distinguish them and find the nuances, but they're very hard to reconcile with the tone and the statements in cases like Wexler and Adobo and Thomas, and all of these other cases. And similarly, this court has decided many cases involving sufficiency of the evidence, many directly involving each of your honors in recent years, in other areas of the law not involving drugs. And this issue never arises. One recent case I'll just cite is the Carbo case, C-A-R-B-O, which is 572 F3-112, which was decided this year, it's an honest services fraud case. And really it's, theoretically it's the same issue, which is did the defendant have knowledge that the purpose of his concealing payments to a public official was to further honest services fraud as opposed to some other type of crime, such as tax evasion. And this court, as it does in every other area, has said, well, you don't have to dismiss every other inference. There's a powerful inference that this was to influence the public official. The Kemp case in 2007 was exactly the same. And so we have a problem. I mean, I don't want to sugarcoat it, but I also want to say that none of those cases, Thomas, Adobo, Wexler, et cetera, involve the additional evidence we have here, where you have the co-conspirator statement corroborated by evidence of how this organization works. That this person's job was to find a warehouse. Just for example, the fact of needing... Wait, Wexler had co-conspirator statements, but none involved the defendant. Exactly. And Wexler, he's only seen as a lookout. He never goes near the truck, which makes it different. Same with Adobo. If there had been evidence in Adobo, to get back to I think it was Judge Hardiman's question, if there was evidence in Adobo that said this person was going up to get the suitcase, he had the cash in his hand, and a co-conspirator said he's then going to unload the suitcase and ship it off where it needs to go, then you'd have facts more akin to what we have here. So we do have that additional evidence here. Well, but in Adobo you also had the defendant say they didn't pack this thing. That's pretty strong evidence that he was expecting something to be there. Your Honor, I am the last person to ask to defend the Adobo decision. The person has $18,000, he needs to know the amount of cash, he's the one who hands it over, he's the one who checks the bag and says they didn't pack this thing, the government lost. What can I say? We would welcome the opportunity to address this in bank, because decisions like that affect charging decisions that are made every day. We do regulate our charges based on these cases, and sometimes it's a very unfortunate decision that needs to be made. What about the testimony about Miguel Morel, that he would feed various people in this chain as little information as necessary until the latest, the last possible time. Here you have Borja, who gets involved with this truck the evening before, and that morning, gets involved with the truck that morning. Isn't it reasonable that you could infer from the information about Morel that Borja did not know what was in that truck that he was unloading? Absolutely. We readily concede that there are opposite inferences that can be drawn from the evidence. And what does that mean? It doesn't mean anything, because of the standard of review. The standard of review is the government does not need to eliminate competing inferences. It needs to show that there is some reasonable inference on which a rational jury could rely. And there certainly was based on the evidence. Now I'm happy to argue the case. In fact, as I know your honors are aware, this was the only issue that was presented to the jury. We're not dealing with a credulous group of people who walked in on the street. We have 12 reasonable citizens who were presented only with this issue. Did he know there were drugs? There was no other dispute about any facts. And when you read the arguments, the closing arguments, that's what it focused on. And these 12 people looked at the evidence and they thought, I'm sure, what I'm about to say, which is that, yes, Morrell did limit the jobs of people in the organization. But still, when you have a job, you need to know at least what your job is and what you're going to do. And it makes no sense whatsoever that you have Morrell and other people responsible for shipping millions of dollars of cocaine across the country, who then at the very last step, after all of these elaborate preparations with the truck and the fake cargo and the fake bills of lading, after all those preparations, they're going to give it to a nobody who knows nothing and trusts that when he gets to wherever he's taking it, that he's not driving it into the arms of law enforcement, into the arms of a rival group. That makes no sense whatsoever. And I'm not surprised in the least that 12 people in their deliberations agreed with the government's view of these inferences and not the opposite view. But are there opposite inferences? The district court cited a number of others in its opinions. Absolutely. We readily concede it. He might have thought these were stolen TV sets. He could have thought anything. But we don't have to eliminate every possibility. We have to be faithful to Jackson versus Virginia and say, is there any reasonable inference that supports the verdict? Can we attribute anything to that whole group of phone calls? I don't know, I think there were 14 or some such thing. Is the government maintaining that as any weight? Oh, definitely, Your Honor. There are 14 calls, I think nine out and two at 5N during that hour where Borea is past the truck. And obviously what he's doing is he's trying to make arrangements to get it to the right place. He's calling the telephone of a known drug dealer and a jury, now that's not enough by itself, but it's one of the grains of evidence that a jury can rely on. Okay, we'll have you back on rebuttal. Thank you, sir. Mr. Patron. If I may please the court. Good afternoon. Thank you. Anthony Patron on behalf of Ruben Borea. Can't we infer that your client knew about the drugs from the circumstantial evidence and the co-conspirator statements? No more so than in Wexler where the defendant in that case participated in counter-surveillance activities of the unloading process. No more than in Thomas. Well, Wexler didn't have co-conspirator statements that implicated the defendant. What you have in those lines of cases, Wexler, Thomas, and Induwu, you have actual surveillances. Yeah, but you have circumstantial evidence. Not circumstantial. For example, in Induwu, you don't have a co-conspirator saying that Induwu was going to open up the suitcase. We have a surveillance that shows that Induwu in fact opens up the suitcase. But isn't there a difference from the language in this case? The guy that's pulling the shots there says he's going to take the driver of the tractor-trailer to finish off what needs to be done inside the truck. He's responsible for taking the truck from his hands to take it to another garage to unload it. Doesn't that put him in the conspiracy? Well, the problem with the government's case is there was never details about this actual unloading process and what was going to happen to the drugs, who was going to participate in this process in Philadelphia. The government characterized this as a very sophisticated plan, but yet what we know, and I tried the case, what we know is by the time the drugs got to Philadelphia no one knew where to find a garage. They spent a greater part of the previous day, Morell and his so-called henchmen trying to find a garage. That's how sophisticated that was. The drugs arrived here, they didn't even know what to do with it. So I take exception to the characterization that this was so sophisticated, it was planned down to the precise step. The bill of lading wasn't real sophisticated. And that had nothing to do with... Produce company called Banana Republic. Right. A little levity in the record there. And quite frankly, and again, that had nothing to do with Borey. I sat through the trial the first two days had nothing to do with me, and they went through all of these details about how it came in from Mexico to Texas and then cross country, and then once we got to Philadelphia they couldn't find a garage. Borey was never mentioned. And interestingly, Alvarado, who is Morell's henchman, one of his close confederates, I think concedes, seemingly, did not know what was in the tractor trailer almost the entire day that he was working hand in hand with Morell trying to find a garage. And if you read the record closely... Where did he say he didn't know? What he says is this. At the end of the day, after he is asked then to assist the driver to find a safe location, Diaz, who was from out of town, Alvarado then gets into the passenger compartment of the tractor. Same seat that Borey the next day sits in. Accompanies him across the city. They park the car. And in the notes of testimony it says what happens is when Alvarado and Morell part company with Diaz. Alvarado says, basically, what's in the truck? And that's when Morell... Why would we infer that that means he doesn't know there's a controlled substance in the truck? Did he not testify at trial that he had a lot of experience transporting drugs on behalf of Morell? He did. He did. So what's in the truck? Wouldn't the most rational inference be, is it heroin? Is it cocaine? Is it marijuana? All of the above? Why would we infer that it's not a controlled substance? Because he almost comes right out and says so. In the trial transcript, and I could point your honors to the exact page, what happens is I believe that it was page 135 of the reproduced record. It's actually 121 of the notes of testimony. Reproduced record 135. He basically says when he parts company with Diaz and he's in the car alone with Alvarado, it is at that moment, he doesn't say this is the first time I really... He says, I asked Morell about what's in the truck and what Morell told me. In fact, Morell lies to him. He says it's 50 kilos. So not only is Morell secretive, he lies to people. So we learn as an example that someone as close to Morell as Alvarado seemingly was in the dark about what was in that tractor trailer for the greater part of that day when he worked hand in hand. Now we want to try to attribute that level of knowledge to Boria, who I would say, based on this evidence, the characterization could be made that he came in in the last minute. Why do we know that they take exception to that? He was nowhere to be found the day before when they were driving around trying to find a garage. His name was never mentioned. Boria himself never utters a word about drugs. Nothing is ever uttered in his presence about drugs. If he's just sort of a dupe or a last minute mule, why is he making 14 phone calls between 6.13 a.m. and 7.13 a.m. to a known drug dealer? Well, number one, we don't know if he knows he's a drug dealer. Just because someone's a known drug dealer doesn't necessarily mean he's his cousin. It means that it's his cousin. Doesn't necessarily mean it. But what does that mean? It means, yes, he's trying to find a garage. We don't take exception to that. There's no question that the evidence... You can't the jury infer though, if he's calling his cousin, who's a known drug dealer, during that hour in the early morning that he was calling him because he knew he had drugs that he was trying to unload. I think there's so many layers. Isn't that all we need to do as a jury? No, I think there's so many layers because, number one, you need to prove that Boria knew he was a drug dealer. You need to know that there was some connection with that man, Barossa, with this drug guy. All we need to find is the jury could have found that inference. Could they have speculated, obviously, as... Inferred. You want to speculate, but inferred. There, I think, lies... Any rational juror. I think there lies the distinction between speculation and permissible inference, when you have so many different layers. You have to prove Boria knew he was a drug dealer. Then we have to prove that Barossa himself had some connection with this operation. And then the further inference is that this had to do with something about drugs, as opposed to any other kind of legal contribution. I would submit that this case never should have went to the jury. The trial judge recognized that. I believe she did the right thing. She followed this court's precedence. Where's the evidence in Ayah Feliz that... I mean, Ayah Feliz was a driver. Right? Where's the evidence that he knew heroin was in the black camera bag that was in the trunk of his car? What the court did in Ayah Feliz was look at the other factors such as, which are distinguishable from this case. His ownership and suspicious operation of the vehicle. The popping of the trunk. Then the bag is removed from the... He's driving his own car. Your client is getting out of bed at 2.30 or 3 in the morning. His girlfriend says it's very odd. No, actually that wasn't the testimony. What happens was she went to bed, I believe. He got home. He went to bed at 2.30 when she woke up the next morning. He was gone. Alright. He comes in at 2.30 and he's gone by 6. Correct. Okay. A little odd. He goes to a parking lot, a public parking lot. Walks around a tractor trailer. Makes 14 phone calls within an hour to a person who is a known drug dealer. I know you say he may not know he's a drug dealer. I mean, that's more normal than I.F. Felice driving his own Cadillac? When somebody else put a black camera bag in his trunk, why would I.F. Felice have more knowledge? I think in I.F. Felice there was direct contact between I.F. Felice and I believe his name was Sindel, the guy who was actually doing the transaction inside the hotel because I believe the additional evidence in that case was both the pager evidence between the two and there was actual telephone contact between the two while the deal was actually going on. True, but there's no evidence as to what they talked about. I agree. So how do you square this decision with I.F. Felice or how do you square Idowu with I.F. Felice? I mean, Idowu was the driver. Cases seem awfully similar to me. I don't know. I think that this court was concerned with the ownership of the vehicle that he actually, the drugs were put into his vehicle that he operated that vehicle. He did it in a suspicious manner and that there was direct telephone contact, not with just some obscure drug dealer but with the actual participants in this drug deal. Well, didn't your client, I thought he was in contact with Morell in the morning in question. No, he was not and that's an important distinction. He was never in contact with Morell. Only Barroso? No, only Alvarado. Your client talked to Barroso. My client talked to Barroso, but I know what your question was. I said only Barroso. I thought he may have had one call with Morell as well. Never. Never. In fact, there was no evidence that they even had a relationship. Well, there was evidence that Morell got him there. And that's a little tricky too. I was sent by Morell. Does that mean that Morell called him? Or does that mean that some other person said hey, Morell wants you to go to this parking lot? So it's a little unclear. And what's also unclear is what was said or told to Boria? Isn't what the District Court did here on the Rule 29 motion and what you're asking us to do is to weigh these inferences? No, actually I'm... Isn't that really what you're asking us to do? You want to argue that the inference that was innocent should have more credibility than the inference that he knew that there were drugs in that truck. Isn't that a weighing function that is not the correct standard? Actually, it is not. I'm not asking the Court to weigh. First of all, there's a couple of principles. What is it then? You know, there is a principle that if an opposite inference may be drawn with equal consistency from the same set of facts, then that inference, if it goes to an essential allegation, in this case it would be knowledge, that that's insufficient. I'm talking about sufficiency. Sure, as Mr. or as the government points out in the brief, anything's possible. But we don't hinge criminal convictions on... That's a standard we charge juries on. We tell them if you can draw two equal inferences, then neither one is proven. But that's not a standard we use on review. We defer to a jury once they've found the... If that were the standard that was applied at the Rule 29 stage, I submit that this case should have never made it... You tried this case. I did. Do you concur with the government that the whole issue was knowledge? Correct. So you argued knowledge. You did your best. Just like you're doing today. You argued knowledge. The jury came back... Just as the defense lawyers did in Wexler and in the other cases that resulted in convictions that this court overturned. Is there any other circuit that follows a rule like this? I can't find one. I do cite a case in my brief at a circuit. I believe it was the Morrison case. I didn't... It's an NPO from the 6th Circuit, isn't it? I think it was... It's an NPO from the 6th Circuit. What concerns me, Mr. Petrone, is absent a statement from a defendant, it's often very difficult to prove things like knowledge and intent. We send people to jail and state courts all the time for murder, for life or worse, based upon an inference of intent to kill from something they've done. Stabbing someone in a vital part of the body. You know the standard. It just strikes me that maybe this is almost insurmountable. Absent a statement from a defendant, yes, I know there are drugs there, and you're not going to get that in most of these drug conspiracies, are you? They're very careful not to say that. But simply because it's difficult to prove doesn't relieve the government of its burden. True. I don't know. Thank you very much for your consideration. Thank you, Mr. Petrone. Mr. Zausman, do you have anything on rebuttal? I'd just like to make a few quick points. I know the court well understands my argument, but just to make the record clear. The concept of equal inferences, I would respectfully suggest is not even valid as a jury instruction. And we don't hear it anymore in this court. There was a precedent for that before Jackson v. Virginia of instructing a jury that if you find equal inferences, one's supporting innocence. You still find it scattered in some decisions from other circuits, but it's wrong. And the government consistently opposes it. This court, in fact, was one of the leaders all the way back to the 1950s, and probably before that, in rejecting that equal inference concept. I was not aware of that. I know you see that in state court systems. You do. But it's certainly wrong as a standard of review on Rule 29 or on appeal, and it's also wrong as a jury instruction. The question is, are there reasonable inferences that a jury can rely on? And a jury is not to be told that if you find equal inferences, you should acquit. That would be an incorrect instruction. The jury here could find direct contact with Mr. Morell. What happens here is Boria shows up, and by the time he gets there, there's no one at the truck. He goes walking around looking. We hear direct testimony that Morell calls Alvarado and essentially says, get back to the truck. And when he gets back... He was out of breakfast at an inopportune time, apparently. Well, they have to eat. They've been there all night, but that's when Boria shows up. And when he gets back, Alvarado confirms with Boria, Miguel sent you. And he says yes. Now, could it be there are layers involved here, as Mr. Petrone suggests? Again, as I keep saying over and over, sure, it's possible, but a jury can look at this sequence and see that there's very close contact here directly with the local person who's supervising this operation. Alvarado certainly did not take drugs until that night. You can easily read his testimony. He's a drug dealer. He knows as well as Boria knows exactly what they're doing there. And that's what the jury found. What he didn't know until that night were the specifics of how much there was, and then Alvarado gets this additional assignment that he's going to take some of the drugs to New York after they're unloaded by Boria. The last thing I'll say with regard to the co-conspirator statements, if I could add one more thing in response to Judge Van Antwerpen, the Salmon case is actually helpful on that. There's the part of Salmon that, of course, we disagree with, like many of these other cases, where the lookout in his conviction is vacated. But there's another defendant in the Salmon case. Fitzpatrick is the lookout. Salmon, though, who's also standing around while this happens, the co-conspirator says, he's the source of the drugs. And on the base of that statement alone, this court affirms Salmon's conviction. We have a very similar statement here. Thank you very much, Your Honor. Thank you. We thank both counsel. The case was well argued, and we'll take the matter under advisement.